

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CAROLINE THONET-BIPS, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 1:16-cv-1067 (AJT/JFA) |
| ) | |
| SEAN MICHAEL BIPS, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner/mother Caroline Thonet-Bips seeks the return of her four-year old child, "N.," under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention")[1] and its implementing legislation, the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001 *et seq.* (2006) ("ICARA").[2] In her Verified Complaint and Petition, filed on August 19, 2016, petitioner claims that based on false allegations that petitioner's domestic partner ("E.H."), with whom petitioner resides in Germany, abused N., the child's father, respondent Sean Michael Bips, is wrongfully retaining N. in the United States following the child's travel from Germany to the United States for agreed upon visitation. *See* Plaintiff's Verified Complaint and Petition Under the Hague Convention for Return of a Child Under 16 Years Old [Doc. No. 1] (the "Petition"), ¶ 1. After a hearing on petitioner's emergency motion for injunctive relief [Doc. No. 2], the Court issued an *ex parte* Temporary Restraining Order on August 19, 2016 prohibiting respondent from removing N. from the Commonwealth of Virginia and ordering respondent to appear before the Court with N.

---

[1] Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501 (1980).
[2] Formerly 42 U.S.C. §§ 11601 *et seq.*

on August 25, 2016. *See* [Doc. No. 7]. On August 25, 2016, respondent appeared with N., as ordered. Respondent was represented by counsel. Petitioner also appeared, having traveled from Germany for these proceedings.

After assessing the availability of information and evidence concerning the merits of the Petition and any affirmative defenses, and the parties' ability to present that evidence, the Court scheduled for August 26, 2016 an evidentiary hearing to determine whether further injunctive relief was appropriate. The Court effectively consolidated this evidentiary hearing with a final bench trial on the merits, subject to further consideration at that hearing as to whether the parties should be afforded additional time to obtain and present evidence not then reasonably available.

The evidentiary hearing took place as scheduled, at which time petitioner presented her own testimony and that of another witness, together with exhibits, and respondent presented his own testimony and that of another witness, together with exhibits. Following the presentation of the evidence, the Court asked the parties for a proffer concerning what, if any, additional information not yet available they would present were the matter continued. In response, petitioner represented that there was no additional evidence that she would present. Respondent also represented there was no additional evidence that he would present, with the exception of the testimony of a child psychologist. In that regard, respondent requested that the case be continued to afford him the opportunity to have N. evaluated by a yet to be selected forensic psychologist with respect to any abuse the child may have experienced at the hands of E.H.

Based on those proffers, the Court took under advisement the following issues: first, whether the evidence presented established by a preponderance of the evidence petitioner's *prima facie* case for return of the child to her in Germany under the provisions of the Hague Convention, and if so, whether respondent established by clear and convincing evidence that

2

"there is a grave risk that [N.'s] . . . return [to Germany] would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Second, if respondent's evidence did not establish his defense under Article 13(b) of the Hague Convention, whether the evidentiary hearing should be left open to allow the respondent to develop and present testimony from a child psychologist.

For the following reasons, the Court herein concludes that under the Hague Convention: (1) petitioner has established that respondent has wrongfully retained N. and that she is entitled to have N. returned to her in Germany; (2) respondent has not established any defense to N's return to petitioner under Article 13(b) of the Convention; and (3) there is insufficient reason to delay a final ruling on the merits of the Petition until a psychological evaluation of N. can be obtained. In support of these rulings, and pursuant to Federal Rule of Civil Procedure 52, the Court makes the following findings of fact and conclusions of law based on the evidence presented at the August 26, 2016 evidentiary hearing.[3]

## FINDINGS OF FACT

1. N. is a minor child born on March 2, 2012 and a citizen of Germany and the United States. Petitioner/mother is a citizen of Germany and currently resides in Wiesbaden, Germany. Respondent/father is a citizen of the United States and currently resides in Woodbridge, Virginia, United States.

---

[3] During the August 26, 2016 evidentiary hearing, the Court reserved on three evidentiary objections by respondent: (1) to an affidavit from E.H. dated August 22, 2016, marked for identification as petitioner's exhibit 6; (2) to testimony by petitioner concerning statements made to her by a German day care provider concerning statements N. had allegedly made to her about E.H.; and (3) to testimony by petitioner regarding statements made to her by the mother of E.H's child. The Court sustains each of respondent's objections on the grounds that those statements constitute inadmissible hearsay under Fed. R. Evid. 802 insofar as they are offered for the truth of the matter asserted.

3

2. Petitioner and respondent were married and lived together in Germany from July 12, 2010 until January 2015.

3. In January 2015, petitioner filed for divorce in Wiesbaden, Germany. Those divorce proceedings are pending. In September 2015, during the pendency of the divorce proceedings, E.H. began residing with petitioner at petitioner's residence. Since the parties' separation, there has been a strained relationship between respondent and E.H., whom respondent has referred to in conversations with N. as "a guy that does bad things."

4. While respondent was living in Germany, the parties evenly divided the time that N. spent with each of them. E.H.'s ten-year old child would, and continues to, also periodically stay with petitioner and E.H. at petitioner's residence. N. has attended kindergarten in Wiesbaden since 2012.

5. In March 2016, respondent relocated from Wiesbaden, Germany, to Prince William County, Virginia. By Agreement dated March 22, 2016, the parties agreed that respondent would have specified visitation rights with N. during certain holiday seasons and for two months each summer, beginning with the period July 1, 2016 through August 31, 2016. It also provided that "[i]t is agreed that it is the mother who will be entitled to decide on the place of residence of the son." Petitioner ("Pet.")'s. Ex. 3.

6. In October 2015, while respondent was still residing in Germany, N. made statements to respondent that caused him to have concerns that the child was experiencing some form of abuse at the hands of E.H. On October 21, 2015, respondent called the Agency for Social Work in the City of Wiesbaden to express his concern that, according to statements made to respondent by N., "his son [] had been hit on the back and stomach by

the partner of the child's mother." Pet. Ex. 1. Following that conversation, the German social worker telephoned petitioner; and the next day, October 22, 2015, the German social worker conducted a house visit. Pet. Ex. 5.

7. In her report following the October 22, 2015 house visit, the social worker stated that "[N.]'s mother interacts with him in a loving and caring way" and that "[N.] appears to be coping well with the change between his father and mother." *Id.*

8. On October 26, 2015, the social worker conducted a second house visit and reported the following:

> [N.] was happy when [E.H.] was there. He sees him as a playmate. [N.] loves it when [E.H.] throws him in the air and plays 'planes' with him. Whilst [N.] was playing, it often seemed as if he was hurt in some way. [N.] would say, for example, that he had hurt himself because of the table or the chair. When his mother or [E.H.] were nearby, [N.] would say that [E.H.] is to blame, or [E.H.], you hurt me," even though [E.H.] or the child's mother could not have done that. [Petitioner] said that she imagined that [N.] had said he had hurt himself whilst playing with [E.H.], the [respondent] had heard that and assumed that [E.H.] had hit him. [Petitioner] said that she could imagine that [respondent] had asked [N.] if [E.H.] had hit him, and that [N.] had confirmed that he had.

*Id.* The social worker concluded that "[t]here is no indication that [N.] is in danger at [petitioner]'s house." *Id.* That German social services agency has again recently confirmed that the October 2015 investigation "did not produce any indications of any danger at the child's mother [*sic*]. The explanations and statements of all the parties were plausible and credible." Pet. Ex. 1 (letter from Agency for Social Work of the City of Wiesbaden dated August 22, 2016). The August 22, 2016 letter further states that upon termination of the October 2015 social services investigation, "[respondent] said that his mind had been put at rest and that he did not require any further discussion." *Id.*

9. As established at the evidentiary hearing, neither petitioner nor respondent has observed any physical signs on N.'s person associated with abuse.

10. On June 29, 2016, N., with petitioner's consent, traveled from Wiesbaden, Germany to London, England where he was met by respondent and respondent's father, and both respondent and N. then traveled to the United States on July 3, 2016. There, respondent and N. were met by respondent's domestic partner S.C. After spending several days in Pennsylvania visiting respondent's relatives, respondent, N., and S.C. all traveled on July 7, 2016 to Prince William County Virginia, where respondent resides with S.C.

11. On July 7, 2016, N. and S.C. were watching the television program *Power Rangers Megaforce* together. N. asked S.C. why Power Rangers "have to have so much power" and S.C. explained that they have to have power to fight "bad people" to protect the world; once S.C. mentioned "bad people," N. responded "like E.H." S.C. testified that while she was concerned by these statement, she did not report them to respondent.

12. The next day, while playing *Power Rangers* with S.C. on the floor of N.'s room, N. said to S.C that he needed to have power like the *Power Rangers* so he can fight "bad guys" like E.H. S.C. asked N. why he kept mentioning E.H., and N. said because he is a "bad guy" and he "hit me." At that point, S.C. testified that she had a "huge concern" but again did not report the comments to respondent. Then, on July 9, 2016, while on an outing for ice scream, N. told both S.C. and respondent that E.H. "hit me." At that point, according to S.C. and respondent, N. "just started spitting it all out . . . spilled all the beans and explained everything in detail," including that E.H. "pulled his eyelids, called him dumb, slapped him in the face," and "squeezed" his "pee pee so hard and would not stop." N. also made comments suggesting that E.H. abused E.H.'s own daughter as well

and said that on one occasion in petitioner's home (in Germany), E.H. became angry and began to shout loudly and threw a lamp, frightening N. so much that N. ran into his room.[4]

13. On the evening of July 9 and the morning of July 10, 2016, respondent and petitioner engaged in a series of contentious text messages. *See* Respondent ("Resp.")'s Ex. 2. Respondent told petitioner "[N.] has been telling me that [E.H.] has been hitting him and that he calls me names and that he is mean to him. I will be reporting this to the US authorities. He told me that he is scared to be around [E.H.]." Petitioner responded by calling respondent's allegations "absolute [*sic*] bogus" and stating that "[N.] for sure does not live in a household where he is scared." *Id.*

14. Since N.'s comments in early July 2016, respondent has attempted to arrange for a psychological evaluation of N. without success. For example, on July 15, 2015, respondent sent several e-mail messages to an American psychologist expressing his concern regarding N.'s situation and seeking a forensic examination of N. The psychologist declined to conduct such an examination absent either a court order or petitioner's consent. Resp. Ex. 3. He also e-mailed a German social services officer[5] expressing his concern about the alleged abuse of N. and alerting the officer to the steps respondent was taking in the United States to obtain custody of N. Resp. Ex. 3A. Finally, respondent contacted who he thought was petitioner's German attorney, alerting

---

[4] During the evidentiary hearing, respondent and S.C. recounted additional instances in which N. said to others, including respondent's father and a hair stylist, that E.H. was a "man that hits him." S.C. also testified that one day when she picked up N. from day care (in the United States), N. told her that he did not want to go back to Germany. When prompted, N. stated to S.C. that it was because he was being "hit by [E.H.]."

[5] This social service official was not the same official with whom the parties interacted in October, 2015.

the attorney that respondent intended to take a variety of actions, including filing for a temporary restraining order, initiating custody proceedings in the United States, and filing a police report. He also advised the attorney that "[N.] will be staying with me in Virginia until [matters] are settled in the United States." Resp. Ex. 4. In response to these communications, petitioner, through her German lawyer, asked respondent to return N. to Germany on July 22, 2016. Respondent refused.

15. On July 27, 2016, petitioner filed a Request for Return under the Hague Convention with the United States Department of State.

16. On July 29, 2016, respondent filed an action for the custody of N. in the Court of Common Pleas of Montgomery County, Pennsylvania Family Court (the "Pennsylvania Action"). Pet. Ex. 8. In the Pennsylvania Action, respondent alleged that N.'s "habitual residence" is Pennsylvania, and that Pennsylvania is N.'s "home state" as defined by § 106(7) of the Uniform Child Custody Jurisdiction and Enforcement Act of 1997. Respondent further represented that he had resided in Pennsylvania from 2014 through 2016. Respondent has conceded that these representations were false and that the filing of the Pennsylvania Action was a "mistake" based on "bad legal advice." Respondent further represented that he would voluntarily dismiss the Pennsylvania Action.

17. On August 17, 2016, respondent again contacted the German social service agency by e-mail with the subject line "Child abuse claim to my son [N.] by [E.H.]." Resp. Ex. 5. In that e-mail, respondent stated "I have a child abuse case to report to you that took place in Wiesbaden, Germany between the months of March and June 2016 and have not heard back from anyone in your office which is TOTALLY NOT ACCEPTABLE ... I was intending to bring back my son to his mother in Germany at the end of August, however

8

with the new report of abuse, I have filed for full custody . . . [m]y wife is threatening to charge me with child abduction through the Hague [C]onvention, however I am simply protecting my son by not returning him to his abuser." *Id.* (emphasis in original).

18. N. was scheduled to return to Germany on August 25, 2016, based on arrangements made before N. left Germany to spend the summer with respondent. Before that scheduled return date, respondent cancelled N.'s airline reservation. Since N's comments in July 2016, respondent has also told N. that that N. should tell petitioner what N. had told respondent (about E.H.), that respondent would keep him safe, and that N. would not be going back to Germany.

19. On August 19, 2016, petitioner filed this action and arrived in the United States on August 24, 2016 for the purposes of this action. By agreement made in open court, N. spent the evening of August 25, 2016 with petitioner. While with petitioner, N., at his request, communicated with E.H. through "Facetime."

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over the Petition pursuant to ICARA, 22 U.S.C. § 9003(a) and (b) and personal jurisdiction over respondent, who currently resides in Woodbridge, Virginia and who was formally served with the summons and Petition on August 24, 2016.

2. The Hague Convention was ratified in the United States on April 29, 1988. Germany is also a signatory to the Hague Convention. The Convention is implemented in the United States through ICARA, enacted in 1988. *See* 22 U.S.C. §§ 9001 *et seq.*

3. Through the Hague Convention, signatory nations, including Germany and the United States, seek "to protect children internationally from the harmful effects of their wrongful

9

removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access . . . ." Hague Convention, Preamble; *see also Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 610 (E.D. Va. 2002). The Hague Convention therefore endeavors "to preserve the status quo" with respect to child custody and "to deter parents from crossing international boundaries in search of a more sympathetic [custody] court." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (citing *Friedrich v. Friedrich*, 982 F.2d 1396, 1400 (6th Cir. 1993)) ("*Friedrich I*"). The Hague Convention and its implementing legislation is premised on the proposition that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. 9001(a)(4). In this respect, the Hague Convention reflects "a strong presumption favoring return of a wrongfully removed child." *Danaipour v. McLarey*, 286 F.3d 1, 13 (1st Cir. 2002).

4. The scope of a federal court's inquiry under the Hague Convention is limited to adjudicating the parties' rights under the Convention, "not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4); Hague Convention, arts. 16, 19; *see also Miller*, 240 F.3d at 398. For that reason, the dispositive issues under the Hague Convention are, in the first instance, whether there has been a wrongful removal or retention within the meaning of the Convention, and if so, whether there is any available defense to a child's return. In short, the scope of the case before the Court is not focused on custody issues pertaining to the "best interests of the child," but in what jurisdiction those issues should be properly considered.

5. ICARA defines and allocates the burdens of proof for various claims and defenses under the Hague Convention. 22 U.S.C. § 9003(e). In that regard, in order to establish that a child's removal or retention is "wrongful" under the Convention, a petitioner must establish "by a preponderance of the evidence" that:

    a. N.'s "habitual residence" was Germany at the time respondent retained N. in the United States;

    b. retention of N. was in breach of petitioner's custody rights under German law; and

    c. petitioner had been exercising those custody rights at the time of retention, or would have been exercising them but for the retention. *Id.* § 9003(e)(1)(A); Hague Convention, art. 3.

6. If petitioner establishes that respondent's retention of N. is wrongful within the meaning of the Hague Convention, the child's return is mandated unless respondent can establish one of the Hague Convention's five affirmative defenses. To establish one of the defenses, Respondent must prove "by clear and convincing evidence" that:

    a. "there is a grave risk" that returning the child to petitioner in Germany would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation"; or

    b. return of N. to Germany would not be permitted by the fundamental principles of the United States "relating to the protection of human rights and fundamental freedoms."

7. Alternatively, respondent may prove a defense under Article 13 to an otherwise wrongful retention by proving "by a preponderance of the evidence" that:

11

c. petitioner's action for return was not commenced within one-year of the wrongful retention and that N. is now well-settled in the United States;

d. petitioner "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention"; or

e. N. "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his] views."[6]

8. All of the available defenses under Article 13 are "narrow." 22 U.S.C. 9001(a)(4). Indeed, if return would further the aims of the Convention, a court retains discretion to order a child's return even if one of the defenses is proven. *Miller*, 240 F.3d at 402; *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) ("*Friedrich II*"). A court has the inherent judicial authority to fashion "undertakings" into its Orders under the Convention. *See Danaipouri v. McLarey*, 286 F.3d 1, 21 (1st Cir. 2002).

9. Courts have given the "grave risk" defense a particularly narrow interpretation based, in part, on the recognition that "courts in the abducted-from country are as ready and able as [American courts] are to protect children." *Friedrich II*, 78 F.3d at 1068. In that regard, courts have cited with approval the following commentary from the United States Department of State on the gravamen of the "grave risk of harm" defense:

> This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interest. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

---

[6] *See generally* 22 U.S.C. § 9003(e); Hague Convention arts. 12, 13, 20.

*See Freidrich*, 78 F.3d at 1068 (citing Pub. Notice 957, 51 FR 10494, 10510 (Mar. 26, 1986)); *see also Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000); *Simcox v. Simcox*, 511 F.3d 594, 604-05 (6th Cir. 2007). Moreover, in order to prevent frustrating the purpose of the Hague Convention, a respondent must prove this defense "with dispatch." *Khan v. Fatima*, 680 F.3d 781, 784 (7th Cir. 2012) (citing Hague Convention art. 11).

10. Upon consideration of the underlying dispute, the Court finds that petitioner has established by a preponderance of the evidence each of the required elements of her claim that the respondent has "wrongfully retained" N. within the meaning of the Convention.

11. First, N.'s "habitual residence" at the time respondent retained him was Germany. Although the Convention does not define "habitual residence," "there is no real distinction between ordinary residence and habitual residence. A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the [retention]. The court must look back in time, not forward." *Miller*, 240 F.3d at 400 (further observing that the parents' citizenship and residence and the child's citizenship are not determinative of the child's habitual residence) (internal citations omitted). The habitual-residence inquiry is fact-specific and should be made on a case-by-case basis. *Id.* Importantly, a parent cannot create a new habitual residence by wrongfully retaining a child. In cases where a child's relocation from an established habitual residence is clearly intended to be of a specific duration (such as a defined visit to see the father during summer vacation), courts have generally refused to find that the changed intentions of one parent can operate to alter the child's habitual residence. *Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 612 (E.D. Va. 2002). Here, N. was born in Germany and has resided in Germany continuously since his

birth. Moreover, there is no real dispute among the parties that N.'s habitual residence is in Germany.

12. Second, respondent's retention of N. was in breach of petitioner's custody rights under German law.

Under the Hague Convention, the "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). These "rights of custody" are to be contrasted with "rights of access," defined under the Hague Convention as "the right to take the child for a limited period of time to a place other than the child's habitual residence." *Id.* art. 5(b).

As part of their on-going divorce proceedings in the German courts, the parties entered into an Agreement dated March 22, 2016, that allocated between them "rights of custody" and "rights of access" as those terms are contemplated by the Hague Convention. Pet. Ex. 3 ("[t]he Parties are undergoing divorce proceedings before *Amtsgericht* – Local Lower Court of First Instance, Wiesbaden . . . [t]he Parties wish to clarify and define issues of contact . . . .").[7] Under that Agreement between the parties, respondent "is permitted [designated visitation] with their son" and "the mother [] will be entitled to decide on the place of residence of the son." Similar to the Fourth Circuit's reasoning in *White v. White*, the Agreement reserves to respondent "*only* the 'right to visit the child.'" 718 F.3d 300, 304 (4th Cir. 2013) (emphasis in original). That court observed that "[t]his language clearly seems to provide that [petitioner] had sole custody and [respondent] had only . . . a 'right of access,'

---

[7] The Agreement also provides that "[d]uring the time in which the child is with the respective parent, said parent shall, in circumstances of urgency, take a decision on his/her own (for example regarding medical matters) except when it has been possible to obtain the other parent's consent otherwise or previously by telephone." The Court does not regard this limited provision, which simply recognizes the implicit duties of any parent in physical possession of a child, to confer "rights of custody" on respondent under Article 5(a).

14

i.e., a 'right to take the child for a limited period of time to a place other than the child's habitual residence.'" *Id.* (citing Hague Convention art. 5(b))

Here, it is clear that petitioner has right of custody under German law as a result of Germany's adoption of the Hague Convention. Respondent's retention of N. is therefore in violation of his rights of access and petitioner's rights of custody under German law.

13. Lastly, the Court finds that petitioner was exercising lawful custody of N. at the time of respondent's retention.

Whether a parent is exercising lawful custody must be determined under the law of the child's habitual residence. *Miller*, 240 F.3d at 402; *Friedrich I*, 983 F.2d at 1042 (6th Cir. 1993). Whether a parent is exercising custody rights should also be viewed liberally. *Friedrich II*, 78 F.3d at 1065 ("[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child). In this regard, it appears settled that a person with valid custody rights to a child under the law of the country of the child's habitual residence does not fail to exercise those custody rights under the Hague Convention "short of acts that constitute clear and unequivocal abandonment of the child." *Id*; *see also Escaf*, 200 F. Supp. 2d at 612.

Here, there is no evidence of abandonment of petitioner's custody rights; and she was clearly exercising her lawful custody rights over the child immediately prior to respondent's retention of the child in the United States. Petitioner granted permission for N. to visit respondent in the United States for a defined period; she did not abandon her child, nor did she consent to the child's retention in the United States. Instead, she immediately objected to the retention once respondent manifested an intent to retain N. in the United States and

vigorously pursued steps both administratively and judicially to compel the child's return to Germany.

14. The Court also concludes that respondent has failed to establish by clear and convincing evidence that there is a "grave risk" that N. will suffer physical or psychological harm by return to his mother in Germany.

There have never been any allegations or concerns that petitioner has abused N. Nor have there ever been any physical signs of abuse by anyone. In this case, the only indications of any possible abuse are the child's own comments, which were originally made and investigated in Germany in October 2015 by German child protective services. That agency concluded that there was no abuse and that the N. was not in danger. N.'s most recent comments are expanded and more detailed versions of those earlier comments, but they, like the earlier comments, are subject to interpretation and completely uncorroborated or substantiated in any way as references to actual abuse, and also are part and parcel of a context involving the child's fascination and perhaps obsession with Power Rangers, as well as the parties' ongoing difficult and at times contentious relationship and respondent's own criticisms and negative characterizations of E.H., which he has conveyed to N. In short, this case has none of the facts or circumstances that have caused other courts to refuse the return of a child based on an Article 13 defense under the Convention. *See, e.g., Van De Sande v. Van De Sande*, 431 F.3d 567 (7th Cir. 2005); *Khan v. Fatima*, 680 F.3d 781 (7th Cir 2012).

Notwithstanding the record, respondent contends, in essence, that there is a grave risk of harm because petitioner cannot or will not adequately protect N. from any possibility of abuse at the hands of E.H. The Court found that both parties testified truthfully with respect to their own beliefs. But the Court has seen nothing that would substantiate respondent's

16

concerns in this regard. Petitioner presented to the Court as a concerned and caring mother, who provided credible testimony, which the Court accepts, that she has never seen any signs of abuse, that she would not tolerate in any respect abuse from E.H., and that if she thought there was any prospect of abuse having occurred or to occur in the future, she would end her relationship with E.H. Moreover, the German authorities have been involved in this matter since respondent's concerns of child abuse first arose in 2015 and are on notice of respondent's continuing concerns. The Court has no reason to think that German authorities are not prepared to act appropriately to protect N., should such action be necessary. Similarly, petitioner has cooperated throughout the German agency's investigation, has continued to communicate with the German authorities concerning N.'s most recent comments, and is prepared to continue her cooperation upon the N.'s return to Germany. In short, the evidence presented is far from "clear and convincing" that any abuse ever occurred or that if N. is returned to his mother, there is a "grave risk" that this smart, active and "rambunctious" four-year old would suffer physical or psychological harm in Germany.

For the above reasons, the Court concludes that the respondent has failed to establish by clear and convincing evidence a defense to his wrongful retention of N. under Article 13(b) of the Hague Convention.

15. Lastly, the Court finds that evidentiary proceedings should not be continued and left open for the purpose of obtaining a psychological evaluation of N.

The respondent has requested that the evidentiary hearing be continued to allow for a forensic evaluation of N, but represents that there is no other evidence that he would present were the record left open. Petitioner opposes such an evaluation for the purposes of the

issues to be decided under the Hague Convention and has represented that there is no additional evidence that she would present were the proceedings continued.

In support of his request for a forensic psychological evaluation of N, respondent does not proffer that such an examination would in fact establish either whether abuse occurred or a solid basis upon which to determine whether N. would face a grave risk of physical or psychological harm upon his return to Germany; and it is unclear what probative evidence such an evaluation would provide. Even if a psychologist were to confirm that the child truly believes E.H. "hit him" or is a "bad person," as the child understand those words, it would be unclear what those beliefs mean in the context of this case with respect to whether he will suffer a "grave risk of harm" were he returned to his mother. Even the respondent concedes that the purpose of the evaluation would be part of an essentially open ended investigation, as he has characterized it, into "what is going on here," which may or may not yield useful information. But under the facts and circumstances of this case, that inquiry, while perhaps appropriate with respect to custody proceedings, does not hold out any reasonable prospect of aiding the Court within a reasonable period of time concerning any potential Article 13 defense.

For these reasons, the Court cannot justify based on the record before it a delay in providing the relief required under the Hague Convention in order to obtain a forensic psychological evaluation of the child. Rather, the Court finds that the attendant delay in these proceedings would likely result in frustrating the purposes of the Hague Convention, which is intended to expeditiously return a child to that jurisdiction deemed most appropriate to conduct any needed evaluations. In this case, that jurisdiction is in Germany.

## CONCLUSION

For the foregoing reasons, the Court finds and concludes that petitioner is entitled to have N. returned to her and to return to Germany with him. Accordingly, it is hereby

ORDERED that judgment be, and the same hereby is, ENTERED in favor of petitioner Caroline Thonet-Bips and against respondent Sean M. Bips; and it is further

ORDERED that respondent immediately return N. to petitioner, together with his necessary travel documents, including passport, and petitioner is hereby authorized to return to Germany with N. Respondent is directed to use his best efforts to facilitate that transfer in a way that protects N. from any ongoing disputes or disagreements between the parties; and it is further

ORDERED that upon returning to Wiesbaden Germany, petitioner (i) notify the appropriate German child protective services that N. has returned to Wiesbaden; (ii) cooperate in any further investigation that the German authorities may pursue; and (iii) provide to respondent such information that he may reasonably request with respect to the nature and outcome of such investigation; and it is further

ORDERED that any motion for fees and expenses pursuant to Federal Rule of Civil Procedure 54 be filed within thirty (30) days of the date of this Order, with any opposition and reply filed in accordance with the Local Rule 7.

The Clerk is directed to forward a copy of this Order to all counsel of record and to enter judgment in favor of petitioner Caroline Thonet-Bips pursuant to Federal Rule of Civil Procedure 58.


/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 29, 2016